In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2219

GERALD A. JUDGE and DAVID KINDLER,

*Plaintiffs-Appellants,*

*v.*

PAT QUINN, Governor of the State of Illinois, and
ROLAND W. BURRIS, U.S. Senator,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 1231—**John F. Grady**, *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED JUNE 16, 2010

Before ROVNER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Constitutional specialists and U.S.
history buffs will recall that the original Constitution of
1787 took a cautious approach toward the election of
public officials. It interposed the Electoral College between
the voters and the President, U.S. CONST. art. II, § 1, and
it provided that each state's two senators would be

chosen by the state legislature, U.S. CONST. art. I, § 3. "Judges of the supreme Court" were to be appointed by the President, "by and with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2. Only the members of the House of Representatives were to be "chosen . . . by the People of the several States." U.S. CONST. art. I, § 2.

In 1913, the Seventeenth Amendment to the Constitution effected a fundamental change in the legislative branch of government by providing for the direct election of senators. The amendment also changed the rules for filling vacancies in a state's senatorial delegation. Under the original Constitution, the executive authority of the state could make a temporary appointment, which would last until the next meeting of the legislature. The Seventeenth Amendment modified that process, to reflect the fact that, in principle, senators were to be elected by the voters. The relevant language is as follows:

> When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided*, That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

U.S. CONST. amend. XVII para. 2. That passage may look straightforward, but this appeal has demonstrated that there is more to it than meets the eye. We must decide whether the system that Illinois is using to fill a famous vacancy in one of its senate slots has strayed so far from the mark that a preliminary injunction should

have been entered by the district court. We conclude that the district court did not abuse its discretion in refusing the requested injunction, and we therefore affirm its order.

## I

### A

Our case began after Barack Obama, then the junior senator from Illinois, won the presidential election on November 4, 2008. The next week, President-elect Obama wrote to Rod Blagojevich, then the governor of Illinois, announcing that the President-elect would resign his position in the U.S. Senate, effective November 16, 2008. Two years and 48 days remained in his six-year term at the time of his resignation. The President-elect's resignation created an immediate vacancy in one of Illinois's two senate seats. On December 31, 2008, then-Governor Blagojevich named Roland Burris, a former Attorney General of Illinois, to assume the Obama seat. A certificate of appointment signed by the governor said that the appointment was to last "until the vacancy . . . caused by the resignation of Barack Obama, is filled by election as provided by law." Mr. Burris took the oath of office on the Senate floor on January 15, 2009.

In the meantime, the Illinois House of Representatives voted to impeach Governor Blagojevich; it returned a wide-ranging article of impeachment alleging that the governor had abused his powers, including his power to appoint a U.S. Senator. On January 29, 2009, the Illinois

Senate convicted Governor Blagojevich and relieved him of duty. Lieutenant Governor Pat Quinn assumed the office of Governor of Illinois.

B

Upon Senator Burris's taking office, David Kindler and Gerald Judge, both registered voters in Illinois, sued Governor Quinn under 42 U.S.C. § 1983, alleging a violation of their rights guaranteed by the Seventeenth Amendment to the U.S. Constitution. The plaintiffs wanted the district court to declare the provisions in the Illinois Election Code for filling U.S. Senate vacancies unconstitutional and to issue an injunction requiring an election to select the person to complete the Obama term. In particular, they objected to the following part of the Illinois Election Code:

> When a vacancy shall occur in the office of United States Senator from this state, the Governor shall make temporary appointment to fill such vacancy until the next election of representatives in Congress, at which time such vacancy shall be filled by election, and the senator so elected shall take office as soon thereafter as he shall receive his certificate of election.

10 ILCS 5/25-8 (West 2010). According to this provision, the date for the election to fill the Obama vacancy is set for November 2, 2010. (Sixty-two days will elapse between that day and the start of the 112th Congress on January 3, 2011.) The plaintiffs argued that this provision of the Illinois Election Code contravenes the second

paragraph of the Seventeenth Amendment by allowing Senator Burris to serve as an appointee for an unreasonably long period of time and by saying nothing about Governor Quinn's duty to issue a writ of election. Governor Quinn's continuing failure to issue a writ of election (and Governor Blagojevich's failure to do so before him), they asserted, violated the same constitutional command. The primary relief that the plaintiffs originally requested was an injunction requiring Governor Quinn to "issue a writ for a special election to be conducted as soon as practical to fill the vacancy."

Their motion for a preliminary injunction asked the court to "order[] the Governor to comply with the Seventeenth Amendment by issuing a writ setting an election to fill the vacancy in the Senate seat, not in November, 2010, but at the earliest practical date." Governor Quinn responded with a motion to dismiss, in which he argued that neither his actions nor the Illinois Election Code violated the federal Constitution. Senator Burris submitted a brief in opposition to the complaint as well, at which point the district court concluded that he was a party that had to be joined under Federal Rule of Civil Procedure 19. The plaintiffs obliged and added him as a defendant.

At that point, the plaintiffs replied to both defendants' motions to dismiss. In this filing, which the district court construed as a reply brief for purposes of the motion for a preliminary injunction, the plaintiffs advanced a new argument: the Illinois statute violated the Seventeenth Amendment because it denied the Illinois governor

discretion to *decline* to make a temporary appointment to a vacant senate seat and to opt instead for an immediate election. In addition, the plaintiffs clarified that they were asking for an injunction "requiring the Governor to issue a writ setting a date for a special election to fill the vacancy in the Obama seat." But the details of their request shifted substantially: instead of pressing for an election at the earliest practical time, they now argued that the election should occur "on a reasonable, but relatively early date," or at a minimum, that "the Governor must be ordered to exercise his discretion by acting to set *some* date for a special election." (Emphasis added.)

On April 16, 2009, the district court granted the defendants' motions to dismiss and denied the plaintiffs' request for a preliminary injunction. The court refused to consider the challenge to the Illinois Election Code that the plaintiffs had introduced in their reply brief. It did, however, dismiss the case without prejudice, allowing the plaintiffs time to amend their complaint to present that claim properly. The plaintiffs did so, but they also appealed the district court's denial of their request for a preliminary injunction. See 28 U.S.C. § 1292(a)(1).

## II

Before turning to the central questions on appeal, we must clarify what exactly is before us. Two of the claims that the plaintiffs have advanced are not. First is the argument that the plaintiffs raised for the first time in their reply brief, to the effect that the Illinois statute is unconstitutional because it requires the governor to make

a temporary appointment when a senate vacancy arises, rather than "empowering" him to choose whether or not to make such an appointment. The district court was under no obligation to entertain this late submission, nor should we. *Spitz v. Tepfer*, 171 F.3d 443, 448 (7th Cir. 1999). Second is the initial contention that Governor Quinn is under an obligation to order an election to fill the vacancy that will take place as soon as possible. The plaintiffs' briefs disavow any argument relating to the timing of the election that they seek, and when we pressed them at oral argument, they explicitly abandoned this position.

More puzzling is whether we may consider the argument that the plaintiffs do make before this court. The plaintiffs take the position that Governor Quinn must issue a writ of election fixing *some* date for an election to fill Illinois's vacant senate seat, but they do not name a date on which that election should take place. Both sides agree that a writ of election must include a date on which the election in question will occur. But the defendants argue that the plaintiffs have waived the argument that a writ must issue regardless of the election date that it incorporates because the plaintiffs did not develop the argument sufficiently before the district court. *E.g.*, *Kunz v. DeFelice*, 538 F.3d 667, 681 (7th Cir. 2008).

In this instance, we conclude that the defendants are being too picky. The district court decided that the procedure prescribed by the Illinois Election Code was all that the Seventeenth Amendment required. It found that Illinois law calls for an election to fill the vacancy at the same time as the November 2, 2010, general election;

Governor Blagojevich appointed Senator Burris to serve until an election took place, as provided by Illinois law; and the total duration of the vacancy—roughly two years, measured from Senator Obama's resignation until the November 2010 general election—was not unreasonable in light of *Valenti v. Rockefeller*, 292 F. Supp. 851 (W.D.N.Y. 1968), summarily aff'd, 393 U.S. 405 (1969) (*per curiam*). The district court concluded that because the plaintiffs could not show that the procedures set out in the Illinois statute violated their constitutional rights, they were not entitled to an injunction requiring Governor Quinn to issue a writ of election calling for a special election to take place prior to November 2010. The court found it unnecessary to decide whether the Seventeenth Amendment requires the governor to issue a writ of election, even if it names November 2, 2010, as the designated date.

We are satisfied that the plaintiffs have preserved their right to argue that a writ of election is constitutionally required. They presented this position both to the district court and in this court. Their argument that Governor Quinn must issue a writ calling for an election to fill the senate vacancy on a date as soon as possible encompasses the claim that the governor must issue a writ of election. As they have asserted since the opening line of their first complaint in the district court, "This is an action . . . seeking to redress the ongoing violation of the Seventeenth Amendment . . . by the failure of defendant, as Governor of Illinois, to issue a writ for a special election to fill a vacancy in the United States Senate." Accordingly, we may consider whether the plaintiffs are

entitled to a preliminary injunction ordering Governor Quinn to issue a writ of election calling for an election specifically to fill out the remainder of President Obama's term in the 111th Congress (rather than an election to choose the junior senator from Illinois for the 112th Congress).[1]

### III

One more preliminary matter must be addressed before we turn to the main event: the defendants argue that the plaintiffs lack standing to pursue the injunctive relief that they seek. This is the case, the defendants say, because the only injury that the plaintiffs allege is the inability to hold the Illinois governor, rather than the state legislature, accountable for setting the date of the election for the vacancy. The defendants assert that this injury is not sufficiently concrete or specific to the plaintiffs to invoke the jurisdiction of the federal courts.

Article III of the Constitution limits federal judicial power to the resolution of cases and controversies. *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007). Standing rules implement this limitation. *Elk Grove*

---

[1] Any senator who completes his or her full six-year term will serve in three Congresses. When Senator Obama first took office on January 3, 2005, he joined the 109th Congress; at the time he resigned in November 2008, the 110th Congress was in its final days; the 111th Congress began on January 3, 2009, and will end on January 3, 2011. Any claim concerning the seven-week Obama vacancy in the 110th Congress is now moot.

*Unified School Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). A plaintiff satisfies constitutional standing requirements by showing that the challenged action of the defendant caused an "injury in fact" that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992). The alleged injury must be concrete and particularized, and either actual or imminent. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

The plaintiffs allege that Governor Quinn's failure to issue a writ of election will injure them because without a writ of election, an election to fill the senate vacancy left by President Obama will never take place—not on November 2, 2010, or any other date. The plaintiffs argue that, if things remain as they are now, Senator Burris will serve until the next Congress begins on January 3, 2011, at which time an entirely new term for one of Illinois's senators will begin. The State of Illinois appears to agree that this will be the practical effect of the state's system. In an opinion letter to leaders in the Illinois legislature, Illinois Attorney General Lisa Madigan wrote: "Under the current language of [10 ILCS 5/25-8], U.S. Senator Burris's temporary appointment will conclude in January 2011 following an election in November 2010, the next election of representatives in Congress." Senatorial Vacancy under the Seventeenth Amendment, 2009 Op. Ill. Att'y Gen. No. 09-001, 2009 WL 530827 (Ill. A.G. Feb. 25, 2009). In addition, the Illinois State Board of Elections's current list of offices that will appear on the November 2, 2010, ballot in Illinois does not specify that there will be an election on that date to fill the balance of President Obama's senate term. See State of Illinois

Candidate's Guide 2010, at i, available at http://www.
elections.state.il.us/Downloads/ElectionInformation/
PDF/2010Canguide.pdf (last visited June 15, 2010). This
evidence suggests that without a writ of election calling
for an election to fill the Obama vacancy, the plain-
tiffs will not have an opportunity to elect a replacement
senator.

It is clear enough that the plaintiffs' alleged injury is
traceable to Governor Quinn's conduct and would be
redressed by a favorable decision. The district court, for
example, could prevent the injury by granting an injunc-
tion requiring Governor Quinn to issue a writ of election
to supply a replacement senator for the fast-waning
Obama term, rather than for the new Congress. The
more substantial issue is whether the plaintiffs have
identified an "injury in fact" that is sufficient for pur-
poses of standing.

The essence of the plaintiffs' claim is their attempt to
vindicate their right to vote for the replacement senator,
rather than have someone appointed by either an
executive or legislative actor. This is precisely what the
Seventeenth Amendment is all about. The first paragraph
says that the Senate "shall be composed of two Senators
from each State, elected by the people thereof" and fixes
the qualifications for electors participating in senatorial
elections. U.S. CONST. amend. XVII para. 1. The second
paragraph implements the general principle of the first
for any vacancies that may arise. Initially, it seems to call
exclusively for elections to fill vacancies, where it says
that "the executive authority of [the] State shall issue writs

of election to fill such vacancies." But then it adds a proviso permitting "temporary" appointments by the executive "until the people fill the vacancies by election as the legislature may direct." U.S. CONST. amend. XVII para. 2. The plaintiffs here believe that Illinois has exceeded whatever authority it may have under the proviso.

The Supreme Court has recognized that plaintiffs have standing to sue when they allege that state election procedures violate their right to vote under the Seventeenth Amendment. In *Gray v. Sanders*, which involved such a challenge to Georgia's primary-election laws, the Court emphasized the long-standing rule that "any person whose right to vote is impaired . . . has standing to sue." 372 U.S. 368, 375 & n.7 (1963) (citing *Baker v. Carr*, 369 U.S. 186, 204-08 (1962); *Smith v. Allwright*, 321 U.S. 649 (1944); *Ashby v. White*, (1703) 2 Ld. Raym. 938, 953-56 (K.B.)). In addition, *Valenti v. Rockefeller*, *supra*, a case summarily affirmed by the Supreme Court, concluded that "plaintiffs alleging that their right to vote to fill a Senate vacancy will be curtailed[] have sufficient standing to maintain this action." 292 F. Supp. at 853 n.1.

It is instructive to compare the procedures adopted in the Seventeenth Amendment to those in the original Constitution for filling vacancies in the House of Representatives. Article I, Section 2 says: "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." U.S. CONST. art. I, § 2, cl. 4. In *Jackson v. Ogilvie*, Illinois voters alleged that the governor had to issue a writ of election calling for an election to fill a vacant seat

in the House, and this court upheld their standing to sue for a deprivation of their right to elected representation. 426 F.2d 1333, 1335 (7th Cir. 1970). We see no reason to treat the current plaintiffs' alleged injury differently. They assert that the governor's failure to issue a writ of election will deny them their right to vote under the Seventeenth Amendment, and their lawsuit represents an effort to prevent interference with that right. This is enough to establish that plaintiffs have been injured in fact and that they have a concrete stake in the outcome of the litigation. See, *e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).

This case does not present a "generalized grievance" so widely shared that the political process provides a more appropriate remedy for the plaintiffs. See *Federal Election Comm'n v. Akins*, 524 U.S. 11, 23-25 (1998); *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975). A voting rights claim strikes at the heart of the political process. Where a plaintiff's voting rights are curtailed, the injury is sufficiently concrete to count as an "injury in fact." See, *e.g.*, *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999); *Akins*, 524 U.S. at 23-25; *Baker*, 369 U.S. at 207-08. In this case, the plaintiffs "are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' . . . not merely a claim of 'the right possessed by every citizen to require that the government be administered according to law.' " *Baker*, 369 U.S. at 208 (quoting *Coleman v. Miller*, 307 U.S. 433, 438 (1939), and *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922), respectively) (internal quotation marks omitted). Bearing in mind that "[n]o right is more precious in a free country than that of having a voice in the election of those who

make the laws under which, as good citizens, we must live," *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964), we conclude that the plaintiffs have alleged a concrete and specific injury that is neither conjectural nor hypothetical, and thus they may proceed with their action.

**IV**

We turn at last to the merits of the interlocutory appeal from the denial of injunctive relief. To justify a preliminary injunction, the plaintiffs must show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm without the injunction, that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). In this case, as in many, the primary reason why the court denied preliminary relief was its assessment of the plaintiffs' likelihood of success on the merits. Accordingly, we begin our discussion there, before turning to the other considerations.

As we noted earlier, the only question properly before us is whether the plaintiffs' assertion that Illinois's governor, by command of the Seventeenth Amendment, must

issue a writ setting an election to fill the Obama vacancy is well taken. Implicit in this inquiry is a practical consideration: must Illinois law somehow assure that the date of such an election is set so that the vacancy is filled some time before the commencement of the 112th Congress? In order to answer this question, we turn to the language of the Seventeenth Amendment, to decide whose reading—the plaintiffs' or the state's—is better founded.

A

Although we have already quoted the second paragraph of the Seventeenth Amendment in full, we set it out again here, identifying this time each of the critical phrases:

> [1] When vacancies happen in the representation of any State in the Senate, [2] the executive authority of such State shall issue writs of election to fill such vacancies: *Provided*, [3] That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election [4] as the legislature may direct.

U.S. CONST. amend. XVII para. 2. The first two phrases appear in what we will call "the principal clause," and the last two in what we will call "the proviso." In interpreting this text, we have taken care not to lose sight of the fact that the provisions for filling vacancies immediately follow the amendment's central command that henceforth the two senators from each state must be chosen by popular election.

### 1. The Principal Clause.

The first part of the principal clause states a condition: a vacancy must "happen" in "the representation of any State in the Senate." We need not tarry here, as there is no question that the President-elect's resignation on November 16, 2008, caused a vacancy to "happen."

The second part of the principal clause does two jobs: it delegates responsibility for addressing the vacancy to "the executive authority" of the affected state, and it tells the executive what to do—that is, to issue a writ of election and thereby assure that the replacement senator will, like the original one, be popularly elected. This clause uses the word "shall," which is normally understood as mandatory language. See, *e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); but see BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 939-41 (2d ed. 1995) (discussing "words of authority" and arguing that "shall" is inherently ambiguous).

Reading the second part of the principal clause to impose a mandatory obligation on the state executive has the virtue of ensuring consistency between this provision and the counterpart language addressing vacancies in the House of Representatives. In this respect, the text of the Seventeenth Amendment is functionally identical to Article I, Section 2 of the Constitution, which governs elections to fill vacant seats in the House of Representatives. Compare U.S. CONST. amend. XVII, with U.S. CONST. art. I, § 2, cl. 4. The drafting history of the Seventeenth Amendment reveals that this was no accident. Senator

Joseph Bristow, who proposed the language that was approved by the 62nd Congress and ratified by the states as the Seventeenth Amendment, identified this similarity when he explained his proposed amendment to the Senate. 47 CONG. REC. 1482-83 (May 23, 1911). (Senator Bristow's comments are the only substantive discussion of the text of the Seventeenth Amendment's vacancy-filling provision in the legislative history of the amendment's passage in Congress.) In *Jackson v. Ogilvie*, *supra*, this court concluded that the language of the House vacancy-filling provision in Article I, Section 2 was "mandatory according to the ordinary meaning of its terms. . . . [I]t renders the issuing of the writs an indispensable duty." 426 F.2d at 1336 (internal citation and quotation marks omitted). Both Article I, Section 2 and part 2 of the Seventeenth Amendment's principal clause command the responsible state official to call an election in which the people can select a replacement senator or representative, should a vacancy arise. We read this language as a mandatory requirement in *Jackson v. Ogilvie*, and we see no reason to take a different approach here for purposes of the Seventeenth Amendment.

### 2. The Proviso.

If the Seventeenth Amendment ended with the principal clause, our task would be over. But it did not. Instead, it added a proviso that permits temporary appointments to the Senate for the period before an election takes place. As the district court observed, the vacancy-filling provision in Article I, Section 2 "does not contain anything

comparable to the Seventeenth Amendment's proviso." The House vacancy provision begins and ends with the imposition of a mandatory duty to call an election for the vacancy. We must therefore consider how the proviso interacts with the principal clause, and then look at the specific system that Illinois has adopted to fulfill its responsibilities.

**a. Temporary Appointment Power.** It should come as no surprise that the drafters of the Seventeenth Amendment contemplated a role for temporary appointments when senate seats were left unoccupied. A similar provision addressing vacancies in the Senate appears in the unamended Constitution. As originally ratified, the Constitution provided, "[I]f Vacancies happen [in the Senate] by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies." U.S. CONST. art. I, § 3, cl. 2. There was some concern during the 1787 Convention and at one state's ratifying convention that this executive appointment power was unwise and unnecessary. See 5 DEBATES ON THE ADOPTION OF THE FEDERAL CONSTITUTION 395 (J. Elliot ed., 1845) [hereinafter ELLIOT'S DEBATES] (remarks of James Wilson); 1 DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 330 (J. Elliot ed., 2d ed. 1836) (declaration of New York upon the ratification of the Constitution). Proponents of executive appointment power prevailed, however, by arguing that appointments were "necessary, in order to prevent inconvenient chasms in the Senate," which would occur because state

legislatures met infrequently. Such "chasms," they urged, might become problematic if they were to last too long, considering the great power of the Senate. 5 ELLIOT'S DEBATES 395 (remarks of Edmund Randolph). Moreover, the extra authority to ensure that vacancies in the Senate were filled promptly reflected the Constitution's broader concern that the states maintain equal representation in the Senate. *E.g.*, U.S. CONST. art. V ("[N]o State, without its Consent, shall be deprived of its equal Suffrage in the Senate.").

The language of the Seventeenth Amendment's proviso follows the same pattern as the original executive appointment provision that the Framers placed in Article I, Section 3. Comparing the language of these two provisions in 1911, Senator Bristow concluded that the proviso "is practically the same provision which now exists in the case of such a vacancy." 47 CONG. REC. 1483 (May 23, 1911). The identity of language in the two provisions supports the idea that the drafters of the Seventeenth Amendment intended to preserve, through the executive appointment power, the states' ability to maintain their representation in the Senate until the group charged with selecting a permanent replacement could exercise its constitutional role. Under both the original and the amended Constitution, the group charged with selecting a permanent replacement—whether the state legislature or the people—was the same one charged with selecting senators in the first place.

**b. Contours of the Appointment Power.** As we explained earlier, we need not, and do not, address

several issues here that the plaintiffs either have not raised or have forfeited. We flag them now only for the purpose of clarifying what is included, and what excluded, from our present ruling. First, we have no occasion to say anything about the proviso's directive that the state legislature may "empower" the executive to make temporary appointments. This capacity to "empower" raises questions about the role of the state legislature compared to that of the state executive in the appointment process.

In addition, we do not have before us any properly presented question about how long a temporary appointment may last under the Seventeenth Amendment, nor the closely related question how much time can elapse between the start of a vacancy and an election to fill it. On the latter point, the parties have discussed the three-judge district court opinion in *Valenti v. Rockefeller*, *supra*, which considered whether a 29-month wait for an election to fill the vacancy left by the assassination of Senator Robert F. Kennedy violated the terms of the Seventeenth Amendment. 292 F. Supp. 851. That court decided that the lapse in time did not offend the Seventeenth Amendment, and the Supreme Court summarily affirmed. When all is said and done, this leaves us without firm guidance from the Supreme Court.[2] See

---

[2] The plaintiffs suggest that *Valenti* has no precedential force whatever because the Supreme Court summarily affirmed the district court's decision on grounds that the case was moot. We need not address this point, given our resolution of this

(continued...)

*Anderson v. Celebrezze*, 460 U.S. 780, 784-85 n.5 (1983) ("[T]he precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions.") (internal quotation marks omitted).

As we noted, the plaintiffs have dropped their argument that Governor Quinn must issue a writ fixing the soonest possible date for a special election. They have pressed only the more modest claim that he has a duty to issue a writ of election that fixes a particular date for the election to fill the vacancy. *Valenti* had nothing to say about that issue. Indeed, *Valenti* could not have decided that question, because before the three-judge district court issued its opinion in the case, Governor Nelson Rockefeller made an appointment to Senator Kennedy's vacant seat and issued "a writ of election . . . for the November 1970 election to fill the vacancy for the remainder of the unexpired term (December 1, 1970, to January 3, 1971)." Motion on Behalf of Appellee to Dismiss or Affirm at 4, *Backer v. Rockefeller*, 393 U.S. 404 (1969) (No. 852) (companion case to *Valenti v. Rockefeller*, 393 U.S. 405 (1969) (No. 773)).

**c. "As the legislature may direct**." The proviso presents one final interpretive issue. The second paragraph, in

---

[2] (...continued)

case. They may, however, be overreaching, considering the fact that the Court itself has discussed aspects of *Valenti* in dicta. See *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10-11 (1982); see also *Lynch v. Illinois State Bd. of Elections*, 682 F.2d 93, 96-97 (7th Cir. 1982).

Part 4 as we have numbered it above, ends with the
phrase "as the legislature may direct." We must decide
which part of the amendment is modified by that phrase:
the entire second paragraph, the entire proviso, or just
the immediate antecedent of that final phrase.

It is relatively easy to dismiss the first of those possi-
bilities. The grammatical acrobatics that would be neces-
sary to read "as the legislature may direct" to modify the
words "shall issue writs of election" are difficult to imag-
ine. This would entail a conclusion that the phrase "as
the legislature may direct" modifies everything in the
entire paragraph—the power to issue writs of election,
the power to make temporary appointments, and the
power to schedule elections to fill vacancies. There is
certainly nothing in the amendment that would warrant
a restriction to one or more of those. The principal clause
of the amendment designates the executive authority as
the authorized actor, and the writ of election as the appro-
priate means for filling a vacancy. There is not a word
about the state legislature, even though the Congress
that drafted the amendment was consciously changing
the system from one that was in the hands of the legisla-
ture to a new one. We do not believe that the same Con-
gress would have re-introduced the state legislature
through such a back-door mechanism.

The plaintiffs suggest two readings, but both of their
interpretations also create problems. The first one involves
treating the final phrase as something that addresses
the entire proviso—in particular, as authorization for the
state legislature to regulate directly the duration of the

executive's temporary appointment. But this approach creates a redundancy. It would require reading the proviso as saying "the legislature of any State may empower the executive thereof to make temporary appointments as the legislature may direct." Second, and somewhat closer to the mark, the plaintiffs suggest that the phrase modifies only the word "election" that immediately precedes it, but that somehow the timing of the election is excluded from the legislature's power. That would be interesting if there were some textual support for it, but there is none. We decline to read a limitation into the Seventeenth Amendment that is not there.

We conclude, therefore, that the phrase "as the legislature may direct" is best read as a straightforward modification of the directly preceding term "election." Any other construction upsets normal rules of English grammar, including the " 'rule of the last antecedent,' according to which a limiting clause or phrase (here, ['as the legislature may direct']) should ordinarily be read as modifying only the noun or phrase that it immediately follows (here, ['election'])." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (our modifications). Accordingly, in addition to establishing the rule that state legislatures may "empower" state executives to make temporary appointments when vacancies arise, the proviso gives the state legislature the power to direct the "election" in which "the people fill the vacanc[y]." We note, before moving on, that the power of state legislatures to regulate elections to fill vacancies in the Senate is not established by the second paragraph of the Seventeenth Amendment alone. To the

contrary, the Elections Clause in Article I, Section 4 of the Constitution instructs the states to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress's power to override those regulations. U.S. CONST. art. I, § 4, cl. 1. We return below to the importance of the Elections Clause to our understanding of the Seventeenth Amendment's vacancy-filling provision.

### 3. The Proviso's Relationship with the Principal Clause.

Next, we must consider how the authorization in the proviso for temporary, executive appointments to the Senate interacts with the principal clause's language indicating that the executive's job is simply to issue writs of election enabling the people to fill senate vacancies. The first issue is whether the proviso is better read as an alternative to the mandate set out in the principal clause, or as an elaboration on the process described in that clause. If it offers an alternative, then there is no doubt that the Illinois General Assembly has exercised its authority in this respect. If it is an elaboration, then we must decide how to reconcile the fact that the proviso authorizes the state legislature to "direct" the details of the election for the vacancy, while the principal clause requires the executive to issue a writ of election, which is a document that normally would specify the date on which the election in question will take place.

**a. Alternative or Elaboration?** The defendants would like us to rule that the principal clause and proviso are "two distinct paths to fill a Senate vacancy." They take the position that when a state legislature (exercising its power under the proviso) empowers the governor to make a temporary appointment and provides for an election, the legislature supplants any role that the executive, the principal clause, or the writ of election might have played. The plaintiffs, on the other hand, argue that the proviso has no bearing on the duty mandated by the principal clause. They view the proviso as a supplemental procedure that does nothing more than permit the state legislature to empower the governor to make a temporary appointment until a vacancy election occurs.

While courts have long recognized that "[t]he general office of a proviso is to except something from the enacting clause, or to qualify and restrain its generality," *United States v. Morrow*, 266 U.S. 531, 534 (1925), "its general (and perhaps appropriate) office is not, alas, its exclusive use," *Republic of Iraq v. Beaty*, 129 S. Ct. 2183, 2190 (2009). In some situations, a proviso will "'state a general, independent rule.'" *Id.* (quoting *Alaska v. United States*, 545 U.S. 75, 106 (2005)). To identify how the proviso in the Seventeenth Amendment functions, it is best to begin by reading the second paragraph as a whole, giving the language "such construction as will permit both the enacting clause and the proviso to stand and be construed together with a view to carry into effect the whole purpose of the law." *American Airlines, Inc. v. Civil Aeronautics Bd.*, 178 F.2d 903, 906-07 (7th Cir. 1949) (quoting *White v. United States*, 191 U.S. 545, 551 (1903)).

The most natural reading of the second paragraph, in our view, leads to the conclusion that the proviso qualifies the principal clause; it does not provide a free-standing alternative. The drafting and ratification history of the amendment supports this interpretation. See, *e.g.*, 47 CONG. REC. 1483 (May 23, 1911) (Senator Bristow, during the debates in Congress over the Seventeenth Amendment, remarked, "My amendment provides [in the proviso] that the legislature may empower the governor of the State to appoint a Senator to fill a vacancy until the election occurs, *and* he is directed by this amendment [in the principal clause] to 'issue writs of election to fill such vacancies.'") (emphasis added); 2 JOHN BOUVIER, A LAW DICTIONARY 483 (15th ed. 1891) ("A proviso differs from an exception . . . . An exception *exempts*, absolutely, from the operation of an engagement or an enactment; a proviso defeats their operation, *conditionally*."). The principal clause describes a chain of events: when a vacancy happens, the state executive issues a writ of election, which calls for an election in which the people will fill the vacancy. The proviso qualifies this chain of events by permitting an appointee to intercede temporarily between the start of the vacancy and the election that permanently fills that vacancy.

**b. Reconciling the Proviso and the Principal Clause.** Once we understand the proviso as a qualification of, rather than an alternative to, the principal clause, we must consider how the command that the state executive "shall issue writs of election to fill . . . vacancies" in the principal clause coexists with the proviso's authorization for vacancy elections to take place "as the legislature

may direct." By its reference to the writ of election, the principal clause invokes a well-established mechanism for ensuring that elections take place. The proviso's statement that the "legislature may direct" vacancy elections calls to mind the role of the state legislatures under the Elections Clause of the Constitution. Once these background principles are understood, the two clauses of the Seventeenth Amendment's vacancy-filling provision are easily reconciled.

i. *The Principal Clause and Writs of Election*. While the writ of election is less famous than the other writ mentioned in the Constitution, U.S. CONST. art. I, § 9, cl. 2 (the "Writ of Habeas Corpus"), it too has a well-established role. The writ of election had long been a predicate to English parliamentary elections. See, *e.g.*, 2 THE CORRESPONDENCE OF HENRY HYDE, EARL OF CLARENDON 226 n.* (Samuel Weller Singer ed., 1828) (quoting 3 F. A. J. MAZURE, HISTOIRE DE LA RÉVOLUTION DE 1688, EN ANGLETERRE 264-65 (1825)) (explaining that King James II attempted to prevent parliamentary elections during the Glorious Revolution by withholding the writ). As the power of the monarch subsided over time, issuance of the writ of election became an increasingly ministerial duty. Still, even today, the writ triggers elections in Britain. See Representation of the People Act, 1983, c. 2, § 23 & sched. 1, pt. 1, § 1.

The role of the writ of election is also apparent in the history of American elections. From the start, the U.S. Constitution has included the requirement that state executives "issue Writs of Election" whenever there is a vacancy in the House. U.S. CONST. art. I, § 2, cl. 4. The

Framers naturally would have viewed the writ as the proper device for initiating an election because the state constitutions referred to writs of election as the exclusive mechanism for filling vacant elected offices. See, *e.g.*, ILL. CONST. of 1818, art. II, § 11; see also DEL. CONST. of 1776, art. 5; GA. CONST. of 1777, art. VII; N.C. CONST. of 1776, art. X; The Northwest Ordinance para. 10, July 13, 1787, 1 Stat. 51 (1789). At the time that the states ratified the Seventeenth Amendment, many states' laws required state executives to issue writs of election to fill vacancies in elected offices. In Illinois, for example, writs of election were required to call vacancy elections for every county and statewide office, as well as the office of U.S. Representative. See ILL. CONST. of 1870, art. IV, § 2; An Act in Regard to Elections, and to Provide for Filling Vacancies in Elective Offices, 1871-72 Ill. Laws, at 400-01, §§ 127-133. Today, the writ of election retains its essential place in state election procedure. See 10 ILCS 5/2A-4 (West 2010); 10 ILCS 5/2A-9(a-5) (West 2010); 10 ILCS 5/25-4 (West 2010); 10 ILCS 5/25-7 (West 2010); see also, *e.g.*, FLA. STAT. ANN. § 100.161 (West 2008); R.I. GEN. LAWS § 17-4-9 (2003); WASH. REV. CODE ANN. § 29A.28.041(2) (West Supp. 2010).

Importantly, at the time that the Seventeenth Amendment was drafted, it was settled that the state executive's power to issue a writ of election carried with it the power to establish the time for holding an election, but only if the time had not already been fixed by law. See GEORGE W. MCCRARY, A TREATISE ON THE AMERICAN LAW OF ELECTIONS 166 (2d ed. 1880); Case XXIII, John Hoge of Pennsylvania, Committee of Elections, 8th Cong. (1804),

reprinted in CASES OF CONTESTED ELECTIONS IN
CONGRESS, FROM THE YEAR 1789 TO 1834, at 135 (M. St. Clair
Clarke & David A. Hall eds., 1834). Even when the time
of a vacancy election is fixed by law, however, the writ
plays the important administrative role of authorizing
state officials to provide for the myriad details necessary
for holding an election (printing ballots, locating voting
places, securing election personnel, and so on).

ii. *The Proviso and the Elections Clause*. The notion that
state legislatures play an essential role in promulgating
the law that governs congressional elections also has
deep roots. There is now a body of federal law that con-
cerns congressional elections, *e.g.*, 2 U.S.C. §§ 1-9, but
the states continue to control many aspects of federal
elections. This is consistent with the proviso in the Seven-
teenth Amendment. The phrase "as the legislature may
direct" affirms that the amendment was not intended to
change the Elections Clause of the original Constitution,
U.S. CONST. art. I, § 4, cl. 1; after all, the Seventeenth
Amendment, as a later enactment, might have modified
it. Under the Elections Clause, the states have "'broad
power' to prescribe the procedural mechanisms for
holding congressional elections," *Cook v. Gralike*, 531 U.S.
510, 523 (2001) (quoting *Tashjian v. Republican Party of
Connecticut*, 479 U.S. 208, 217 (1986)), limited only by
Congress's power to "make or alter such Regulations," U.S.
CONST. art. I, § 4, cl. 1; *Buckley v. Valeo*, 424 U.S. 1, 131-32 &
n.174 (1976). But the Elections Clause does not just em-
power; it "expressly requires action by the States" when it
comes to regulations for congressional elections. *U.S. Term
Limits v. Thornton*, 514 U.S. 779, 804-05 (1995); accord *id.*
at 862-63 (Thomas, J., dissenting).

The balance between the states' power and that
of Congress to regulate congressional elections was a
substantial issue when the Constitution was being
drafted, see 5 ELLIOT'S DEBATES 401-02; THE FEDERALIST
No. 59 (Hamilton), and it remained a contentious topic
more than a century later as the Seventeenth Amendment
worked its way through Congress. In fact, with the excep-
tion of the principal question whether the people
should directly elect senators, no issue was more hotly
debated than whether the states should control
senatorial elections exclusively or Congress should
retain a role.[3] In all of the legislative history related to the

---

[3] In both the 61st Congress, where the Senate narrowly defeated
a proposed amendment, and the 62nd Congress, which ulti-
mately passed the amendment, the debate over federal control
of senatorial elections commanded significant attention. See,
*e.g.*, 46 CONG. REC. 847-48 (Jan. 13, 1911) (Sen. Sutherland); *id.* at
1161-69 (Jan. 20, 1911); *id.* at 1335-39 (Jan. 24, 1911) (Sen. Depew);
*id.* at 2426-27 (Feb. 13, 1911) (Sen. Curtis); *id.* at 2491-98 (Feb. 14,
1911) (Sens. Bourne and Brown); *id.* at 2645-57 (Feb. 16, 1911)
(debate between Sens. Sutherland and Borah); *id.* at 2756-63
(Feb. 17, 1911) (Sen. Rayner); *id.* at 3307 (Feb. 24, 1911) (Senate
approves amendment retaining federal oversight of senatorial
elections); 47 CONG. REC. 203-43 (Apr. 13, 1911) (House debate
on proposed amendment); *id.* at 1482-90 (May 23, 1911) (Senate
debate on Sen. Bristow's proposal); *id.* at 1879-1925 (June 12,
1911) (Senate debate on proposed amendment); *id.* at 1884-1924
(June 12, 1911) (Sen. Bacon's opposition to federal control); 48
CONG. REC. 6347-69 (May 13, 1912) (passage of proposed
amendment through Congress). See generally JOSEPH L. BRISTOW,

(continued...)

passage of the Seventeenth Amendment, however, no member of Congress ever expressed doubt that state legislatures were the central actors when it came to passing laws that governed the election of senators.

The plaintiffs are correct that neither the proviso of the Seventeenth Amendment nor the Elections Clause over-rides the duty of the state's executive to issue a writ of election when a vacancy occurs. It does not necessarily follow, however, that the executive's power to issue a writ of election includes the power to select any election date whatsoever. What is clear is that traditional writs of election always include a date. At the same time, the state legislature may pass laws that establish a range of dates from which the state executive may choose, and might even limit that set to a single day. In this way, the state executive's duty to issue a writ of election that

---

3 (...continued)
RESOLUTION FOR THE DIRECT ELECTION OF SENATORS, S. DOC. NO. 62-666, at 7-8 (1912); 1 GEORGE H. HAYNES, THE SENATE OF THE UNITED STATES: ITS HISTORY AND PRACTICE 106-115 (1938); 1 ROBERT C. BYRD, THE SENATE, 1789-1989: ADDRESSES ON THE HISTORY OF THE UNITED STATES SENATE, S. DOC. NO. 100-20, at 389-406 (1988). The question of federal control over senatorial elections left the Senate evenly divided, and it took the vote of Vice President James Sherman to decide the question in favor of retaining a role for federal oversight. See 47 CONG. REC. 1923 (June 12, 1911). The issue kept the proposed amendment tied up in a Conference Committee of the House and Senate for nearly a year. *Senators by Direct Vote Passes House*, N.Y. TIMES, May 14, 1912, at 1.

includes a date for the election is constrained by, but not replaced by, the state legislature's obligation to direct elections to fill vacancies.

A recent example from Illinois illustrates this division of power. When Representative Rahm Emanuel resigned his seat in the House of Representatives on January 2, 2009, to become President Obama's Chief of Staff, he left a vacancy. Governor Blagojevich then issued a writ of election commanding the clerk of the county encompassing the affected congressional district "to cause a SPECIAL ELECTION to fill such vacancy . . . on TUESDAY, April 7, 2009." The Illinois law that governs vacancies in the House provides a range of dates within which a vacancy election must occur, and Governor Blagojevich's writ of election incorporated a date within that range. See 10 ILCS 5/25-7 (requiring the Illinois governor, under these circumstances, to choose a day "within 115 days"). This reflects a common pattern. See, *e.g.*, MASS. ANN. LAWS ch. 54, § 140(a) (LexisNexis Supp. 2010) (effective Dec. 23, 2009) (requiring the governor, in some circumstances, to issue precepts fixing a date for a vacancy election between 145 and 160 days after the vacancy occurs); WASH. REV. CODE ANN. § 29A.28.041(2) (giving the executive discretion, in some circumstances, to pick any date for the vacancy election more than 90 days later than the date that the writ issues).

Read as a whole, therefore, the second paragraph of the Seventeenth Amendment sets up a system under which the principal clause and proviso assign complementary roles to the state's executive and legisla-

tive authorities in the process of filling senate vacancies. Nothing about the state legislature's power to direct the election to fill a vacancy qualifies or nullifies the executive's duty to issue writs of election.

**4.  Filling Vacancies under the Seventeenth Amendment.**

To summarize, the vacancy-filling provision in the second paragraph of the Seventeenth Amendment imposes two requirements. First, every time that a vacancy happens in the state's senate delegation, the state must hold an election in which the people elect a permanent replacement to fill the vacant seat. Second, the executive officer of the state must issue a writ of election that includes a date for such an election to take place. Whether the vacancy is first filled by a temporary appointee, as permitted by the proviso, is a matter left up to the state and is governed by state law. The temporary appointment ends when the people fill the vacancy in an election.

State law controls the timing and other procedural aspects of vacancy elections. The Elections Clause obliges the states to make these rules, and the final phrase of the Seventeenth Amendment's second paragraph reaffirms this role. The state legislature's power to make laws governing vacancy elections is limited by Congress's power under the Elections Clause to "make or alter" such regulations. To the extent that the plaintiffs argue that the governor must be able to select a date for the vacancy election of his own choosing, they are

incorrect. The amendment does not disturb the power of the state legislature to confine the governor's discretion in selecting a date.

If the state legislature has exercised that power, then the state executive must name a date consistent with the state's law in the writ of election. In such a circumstance, the writ still has a critical role: it announces to the voters the time and place of the election; it sees that the electoral machinery is engaged; and it guarantees that an election for the vacancy will actually take place on the date directed. Where state law leaves room for executive discretion (as was the case when Representative Emanuel resigned), the executive may select a date within the authorized range. As a result, the defendants' position that the duty of setting a date for the vacancy election is entirely the prerogative of the state legislature is somewhat misleading. If the state legislature leaves a measure of discretion over the timing of a vacancy election to the state executive, the state executive may exercise that discretion.

So understood, the second paragraph of the Seventeenth Amendment establishes a rule for all circumstances: it imposes a duty on state executives to make sure that an election fills each vacancy; it obliges state legislatures to promulgate rules for vacancy elections; and it allows for temporary appointments until an election occurs. This demarcation of constitutional powers and duties between state executives and state legislatures advances the Seventeenth Amendment's primary objective of guaranteeing that senators are selected by the people of the states in popular elections.

B

This rather extended look at the underlying merits of the plaintiffs' claim has been necessary in order to evaluate their likelihood of success, as it bears on the district court's decision not to grant a preliminary injunction. As the case now stands, the plaintiffs take the position that the Seventeenth Amendment requires Governor Quinn to issue a writ of election calling an election to fill President Obama's vacancy in the Senate, and the state is arguing that he is under no such obligation. Our analysis of the Seventeenth Amendment convinces us that the plaintiffs have shown a strong likelihood of success on the merits. The governor has a duty to issue a writ of election to fill the Obama vacancy. That writ must include a date, but it appears that the Illinois legislature has provided only one date from which Governor Quinn may choose: November 2, 2010.

The plaintiffs would like us to rule that the provision of the Illinois Election Code governing senate vacancies, 10 ILCS 5/25-8, is unconstitutional because it *prevents* Governor Quinn from choosing an earlier date, and thus from allowing the people to be represented by an elected Senator rather than a temporary appointee. We have already concluded, however, that this issue is not properly before us, and so we express no opinion on that aspect of Illinois's system.

We note, however, that the Illinois statute does not expressly prevent the governor from issuing a writ of election whenever he chooses. Some other states' statutes that concern senate vacancies explicitly prohibit the

state executive from issuing a writ in certain circum-
stances, *e.g.*, CONN. GEN. STAT. ANN. § 9-211(a)(3) (West
2009) (if the vacancy occurs within 62 days of a
scheduled election, "the Governor shall not issue such
writs and no election shall be held"), but the Illinois
statute contains nothing close to the prohibitory
language used by these laws. Nor does the Illinois statute
appear to command the governor to issue a writ of
election. While it is true that some state laws explicitly
require the writ to issue, *e.g.*, FLA. STAT. ANN. § 100.161,
such a statutory command to the state executive is not
necessary. The language of the Seventeenth Amendment
is enough on its own to authorize the executive's action,
no matter what state law says or does not say. It is
enough that the plain language of 10 ILCS 5/25-8
does not seem to interfere with the governor's constitu-
tional obligation to issue a writ.

This is not to say that the plaintiffs' concern that a
vacancy election may not happen is misplaced. Such an
event would be far from unprecedented. Based on our
review of U.S. Senate historical documents, there were
193 vacancies in the Senate between the ratification of
the Seventeenth Amendment and the election of Presi-
dent Obama (excluding vacancies caused by a senator's
leaving office after a successor is regularly elected). See
Senate Historical Office, Senators of the United States 1789-
2009 (Feb. 2010), http://www.senate.gov/artandhistory/
history/resources/pdf/chronlist.pdf (last visited June 15,
2010); BIOGRAPHICAL DIRECTORY OF THE UNITED STATES
CONGRESS, 1774-2005, H.R. DOC. NO. 108-222 (2005),
updated version at http://bioguide.congress.gov/biosearch/

biosearch.asp (last visited June 15, 2010). Twenty-seven of those vacancies were filled by an appointee who served the remainder of the senate term in question; in those 27 cases, the election to fill the senate vacancy that is required by the Seventeenth Amendment never took place. (Notably, there was never an election to fill the vacancy that was the subject of *Valenti v. Rockefeller*, *supra*.)

Even though Illinois law appears to set a date for an election to fill a vacancy in the Senate, and Governor Blagojevich's certificate of appointment provided that Senator Burris was to serve "until the vacancy . . . is filled by election as provided by law," the plaintiffs and the Illinois executive branch have taken the position that Senator Burris will remain in office until the next Congress convenes on January 3, 2011. The defendants did not dispute that Senator Burris's tenure will last this long in their briefs or at oral argument. This supports the plaintiffs' argument that President Obama's vacant senate seat may be occupied during the lame-duck session of Congress (November 2, 2010 to January 3, 2011) by a replacement senator who has not been elected by the people. We are not prepared to say that this is such a short period of time that it should be dismissed as *de minimis*. See *Jackson*, 426 F.2d at 1337 ("We are not prepared to say as a matter of law that representation from the time the results of the November . . . election will be determined to January 3 [of the following year] is *de minimis*.").

What is still missing here is a writ of election. Even though the Illinois statute sets November 2, 2010, as the

date for the election to fill the Obama vacancy, that does not mean that the writ is superfluous. To the contrary, a writ of election from Governor Quinn would serve the important function of guaranteeing that the people of Illinois may elect a replacement to President Obama's vacant senate seat on the date set by the Illinois legislature. In addition, it would announce to voters that there will be, in effect, two elections on that day—one to elect a replacement to fill the vacancy and one to elect a senator to the next Congress.

No one has raised, and we therefore do not address, the question how the state is to decide whose names should be on the November 2 ballot for the Obama vacancy. The state might propose a solution acceptable to all parties (*e.g.*, using the candidates who have already qualified for the election for the 112th Congress), so long as that solution complies with Illinois and federal law. We conclude that this issue is better addressed in the first instance by the district court. However Illinois conducts its election for the vacancy, the replacement senator presumably would present his or her credentials to the Senate and take office immediately, while the senator elected to begin service with the 112th Congress would not take office until January 3, 2011.

C

Senator Burris offers a different reason—one based on federal law—why plaintiffs cannot succeed on the merits of their claim. Relying on federal election law, 2 U.S.C. §§ 1, 7-8, and *Foster v. Love*, 522 U.S. 67, 69-74 (1997), he

argues that November 2, 2010, is the only date on which Illinois can hold an election to fill President Obama's seat. Because we have decided that the timing of the election is not properly before us, however, we have no comment on this argument.

## V

It is not enough for the plaintiffs to show a likelihood of success on the merits. Critically, they must also show why they will suffer irreparable harm if the preliminary injunction they want does not issue. *Winter*, 129 S. Ct. at 375-76. It is there that their case founders. When they decided to abandon their argument that the special election had to occur as soon as practicable, they effectively disclaimed any urgency in the matter that might justify preliminary injunctive relief. Confronted at oral argument, they were unable to suggest any irreparable harm that they were seeking to avoid. In their reply brief, the plaintiffs address harm in a cursory fashion, which really just reiterates their merits argument. We have made clear in the past that "[i]t is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel," and we have warned that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (internal quotation marks omitted). The fact that the plaintiffs leave us essentially in the dark about the irreparable harm that they confront makes it impossible for us to conclude that the

district court abused its discretion when it denied the preliminary injunction.

There is still time for the governor to issue a writ of election that will call for an election on the date established by Illinois law and that will make it clear to the voters that they are selecting a replacement for Senator Obama. The district court can easily reach and resolve the merits of this request before any of the harm that the plaintiffs forecast comes to pass. Moreover, circumstances change: Governor Quinn might issue a writ of election tomorrow, or next week.

We detect no irreparable injury that will be avoided through preliminary relief. Bearing in mind that our review is under "the highly deferential abuse of discretion standard," *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Locomotive Eng'rs*, 367 F.3d 675, 678 (7th Cir. 2004), we see no reason to upset the district court's decision to deny the preliminary injunction.

We AFFIRM the order of the district court denying preliminary injunctive relief.